[No. B028490. Second Dist., Div. Four. June 15, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
GREGORY SCOTT ANDERSON et al., Defendants and Appellants.

**[Opinion certified for partial publication.†]**

---

† Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I-VI.

**COUNSEL**

Anita Susan Brenner, Jolene Larimore, Joseph P. Farnan and Richard Jay Moller, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, Mark Alan Hart and Sharlene A. Honnaka, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GEORGE, Acting P. J.**—Following a jury trial, defendants Gregory Anderson, Diane Navarro,[1] Richard Navarro, and Richard Valles were convicted of shooting at an inhabited dwelling (Pen. Code, § 246),[2] burglary of the residence of Anna Argostino (§ 459), robbery of Argostino committed within a residence (former § 213.5),[3] forcible sexual penetration by a foreign object upon Argostino (§ 289, subd. (a)), two counts of assault with force likely to produce great bodily injury upon Theodore Nelson and Eric Rivera, respectively (§ 245, subd. (a)(1)), and conspiracy to commit robbery (§ 182, subd. (a)(1)).[4] The jury found true the following additional allegations: all defendants except Richard Navarro used firearms in the commission of the burglary of the residence of Argostino and the robbery of Argostino (§ 12022.5, subd. (a)), a principal in those offenses was armed with a firearm (§ 12022, subd. (a)), and Valles used a firearm in the commission of the assaults with force likely to produce great bodily injury upon Nelson and Rivera (§ 12022.5, subd. (a)).[5]

Prior to sentencing, Richard Navarro admitted he had suffered a previous conviction of a serious felony. (§ 667, subd. (a).) Diane Navarro having waived her right to a jury trial, the trial court found she also had suffered a previous conviction of a serious felony. (§ 667, subd. (a).) Anderson was sentenced to a total term of 19 years in prison; Diane Navarro was sentenced to a total term of 24 years in prison; Richard Navarro was sentenced to a total term of 23 years in prison; and Valles was sentenced to a total term of 19 years in prison.

[1] The information refers to this defendant as "Cynthia Lewis, aka Diane Navarro." Defendant testified at trial that her "real name" is Diane Navarro, and the parties refer to her as such.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

[3] Former section 213.5 read: "Every robbery perpetrated in an inhabited dwelling house or trailer coach as defined in the Vehicle Code is punishable by imprisonment in the state prison for three, four, or six years." This statute has been superseded by sections 212.5 and 213.

[4] Defendants were found not guilty of attempting to murder Argostino, Deputy Sheriff Wayne Liberator, Deputy Sheriff Andrew Lee, Deputy Sheriff Victor Lopez, and Deputy Sheriff Jack Mayer.

[5] The jury found not true the allegations that Valles inflicted great bodily injury upon Nelson and Rivera in the commission of the assaults with a deadly weapon. (§ 12022.7.)

Defendants raise numerous issues on appeal. In the published portion of our opinion, we address the question which the Supreme Court expressly left unresolved in *People* v. *Siko* (1988) 45 Cal.3d 820, 822 [248 Cal.Rptr. 110, 755 P.2d 294], and hold that notwithstanding the provisions of section 654, section 667.6, subdivision (c), authorizes the imposition of consecutive full-term sentences for enumerated sexual offenses constituting separate acts committed during an "indivisible" or "single" transaction. Accordingly, we affirm the judgment.

FACTS

On Saturday, May 17, 1986, Joseph Argostino took his family on a weekend vacation. He asked his 18-year-old sister Anna to care for his dog during their absence.

On Saturday evening, Anna Argostino arrived at her brother's house accompanied by her 18-year-old friend, Debbie Pitzer. They later were joined by Eric Rivera and Ted Nelson, both of whom were 18 years of age.

Shortly before 3 a.m. on Sunday morning, the four defendants arrived at the Argostino residence in an automobile bearing a "U.S. government license plate" with a flashing red light on the dashboard and the letters "A.T.F." on the trunk lid.[6] They parked on the front lawn, and Richard Navarro remained in the driver's seat of the vehicle with the engine running while the other defendants rushed to the front door and demanded entry, shouting: " 'Federal agents, federal agents. This is a drug raid.' "

Nelson, who had been watching television in the living room, ran into the front bedroom to wake Rivera as a gunshot passed through a bedroom window. Nelson and Rivera fled to the living room as defendants began shooting at the front door. Nelson ran into the back bedroom and hid under the bed.

As Rivera stood in the living room, the front door broke open and Anderson, Diane Navarro, and Valles entered. Valles was carrying a shotgun. Anderson and Diane Navarro were carrying handguns. Valles and Anderson were dressed in blue jumpsuits bearing the insignia "A.T.F." on the back and wore what appeared to be police badges on their chests.

Anna Argostino dialed 911 on the telephone as defendants were entering the residence. Before she had an opportunity to speak, however, Valles

---

[6] It appears the letters "A.T.F." were intended to refer to the federal Bureau of Alcohol, Tobacco and Firearms.

entered the house, grabbed Argostino, and pulled her toward Anderson, who asked her who owned the house. Argostino told him it was her brother's house.

Pitzer was taking a bath when she heard defendants banging on the front door and yelling: " 'A.T.F. federal agents.' " She then heard gunshots. She got out of the bath and was dressing when Anderson ordered her out of the bathroom and kicked a hole in the locked door. At Anderson's direction, Pitzer crawled out of the bathroom and lay down in the hallway. Valles then threw Rivera to the floor next to Pitzer. Valles kicked Rivera in the head several times, then pulled Rivera's head up by his hair and asked him, " 'Where's the box? Where's the key?' " When Rivera told him he did not know, Valles threw Rivera's head back to the floor, causing it to hit a heating grate.

Argostino was forced to lie down next to Pitzer. As she lay there, Valles asked Argostino "where the box and key were" and kicked her in the head and ribs. Argostino told Valles she did not know what he was talking about. Valles held the shotgun to Argostino's back and head. Argostino, who was wearing a cotton jumpsuit, then felt the barrel of the shotgun penetrate her rectum. The shotgun barrel was inserted into her rectum with force, causing her pain and necessitating subsequent medical treatment. Valles stated, " 'I want the keys,' " and told Argostino she had until the count of three to tell him where the keys were. He began counting. Argostino screamed that she did not know. After Valles said, "three," Argostino heard a "click" that sounded like the trigger of the shotgun had been pulled. Valles said, " 'Oh, shit,' " removed the gun from her rectum, and left.

Valles discovered Nelson hiding in the back bedroom and struck him on the back of the head with a handgun five or six times. Valles then fired three shots into a desk to force it open. A short time later, someone yelled, " 'The cops are here,' " and Valles left the bedroom.

Deputy Sheriff Victor Lopez arrived at the scene and found Richard Navarro sitting behind the wheel of defendants' vehicle on the front lawn of the residence. Deputy Lopez asked Richard Navarro what he was doing, and he replied he was a federal agent conducting a "drug bust." A short time later, a shotgun was fired from the house at Deputy Lopez, precipitating a brief gun battle, after which defendants surrendered. Some personal property, including two watches and a ring found to be missing from a desk drawer, were recovered from Valles's pocket following his arrest.

Valles testified that he and Anderson lived in Bakersfield; that on May 14, 1986, Valles had telephoned Richard Navarro, who proposed that

Valles and Anderson come to Los Angeles for the purpose of committing a robbery of "dope dealers"; and that Valles had expected to gain between $4,000 and $10,000 in cash and drugs from the robbery.

DISCUSSION

I-VI*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

VII

IMPOSITION OF A FULL-TERM CONSECUTIVE SENTENCE UNDER SECTION 667.6, SUBDIVISION (C), RENDERS INAPPLICABLE SECTION 654's PROSCRIPTION AGAINST MULTIPLE PUNISHMENT FOR SEPARATE OFFENSES THAT ARE PART OF AN INDIVISIBLE TRANSACTION

■■■ Diane Navarro contends the trial court violated section 654 by imposing multiple punishment for the robbery of Anna Argostino, the shooting at an inhabited dwelling, and the forcible sexual penetration of Argostino by a foreign object. Richard Navarro joins in this contention.

Although the total terms of incarceration received by the four defendants varied due to enhancements arising from prior convictions, each defendant's sentence included the upper term of six years in prison for first degree robbery of Argostino, a consecutive term of one year (one-third the middle term) for shooting at an inhabited dwelling, a consecutive term of one year (one-third the middle term) for assault upon Ted Nelson with force likely to produce great bodily injury, a consecutive term of one year (one-third the middle term) for assault upon Eric Rivera with force likely to produce great bodily injury, and, pursuant to section 667.6, subdivision (c), a consecutive term of eight years (the full upper term) for forcible sexual penetration of Argostino by a foreign object. Sentence on the burglary and conspiracy to commit robbery counts was imposed but was stayed pursuant to section 654.

Section 654 states, in pertinent part: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one . . . ."

* See footnote, *ante*, page 331.

■ " 'The proscription against double punishment in section 654 is applicable where there is a course of conduct which . . . comprises an indivisible transaction punishable under more than one statute . . . . The divisibility of a course of conduct depends upon the intent and objective of the actor, and if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one.' [Citation.] 'The defendant's intent and objective are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support a finding the defendant formed a separate intent and objective for each offense for which he was sentenced. [Citation.]' " (*People* v. *Coleman* (1989) 48 Cal.3d 112, 162 [255 Cal.Rptr. 813, 768 P.2d 32].) "[I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once. [Citation.]" (*People* v. *Harrison* (1989) 48 Cal.3d 321, 335 [256 Cal.Rptr. 401, 768 P.2d 1078].)

■ We first consider whether imposition of multiple punishments was permissible for the robbery of Argostino, the shooting at an inhabited dwelling, and the assaults upon Nelson and Rivera, leaving aside for the moment defendant's sentence for forcible sexual penetration of Argostino by a foreign object which is separately discussed below. The offense of shooting at an inhabited dwelling and the assaults upon Nelson and Rivera simply were means of accomplishing the burglary and robbery and were incident to the single objective of forcibly entering the residence in order to rob the occupants of money and drugs. (*People* v. *Perez* (1979) 23 Cal.3d 545, 551 [153 Cal.Rptr. 40, 591 P.2d 63].) Nevertheless, multiple punishment is not precluded because these were violent offenses involving different victims. ■ "[A] defendant may be punished for those convictions arising from an indivisible course of conduct which are based on crimes of violence committed against different victims. [Citation.]" (*People* v. *Robinson* (1988) 198 Cal.App.3d 674, 678 [244 Cal.Rptr. 17].)

The court in *People* v. *Masters* (1987) 195 Cal.App.3d 1124 [241 Cal.Rptr. 511] upheld multiple punishment for assault with a deadly weapon and shooting at an occupied motor vehicle where the defendant fired shots into an automobile containing three passengers, injuring one of them. The court held: "The preclusion of section 654's application does not depend upon a determination that the victims of one violent crime are entirely different from the victims of a second violent crime committed in the same course of conduct. As long as each violent crime involves at least one different victim, section 654's prohibition against multiple punishment is not applicable. [Citations.]" (*Id.,* at p. 1128.)

■ Argostino was the victim of the robbery. Nelson and Rivera were the victims of the assaults. The victims of the shooting into an inhabited

dwelling were the occupants of the residence: Argostino, Nelson, Rivera, and Pitzer. This offense, therefore, involved one victim (Pitzer) different from the victims involved in the other violent offenses. Because each violent offense involved at least one different victim, multiple punishment was not precluded. (*People* v. *Masters, supra,* 195 Cal.App.3d 1124.)

Turning to the offense of forcible sexual penetration by a foreign object (§ 289, subd. (a)), we conclude this offense simply was a means of accomplishing the robbery and was incident to the single objective of robbing the occupants of money and drugs. (*People* v. *Perez, supra,* 23 Cal.3d 545, 551; *People* v. *Brown* (1989) 212 Cal.App.3d 1409, 1427 [261 Cal.Rptr. 262]; *People* v. *Davis* (1987) 191 Cal.App.3d 1365, 1369 [236 Cal.Rptr. 887]; *People* v. *Galvan* (1986) 187 Cal.App.3d 1205, 1218-1219 [232 Cal.Rptr. 410].) The victim of this offense, Anna Argostino, also was the victim of the robbery. Therefore, if applicable, section 654 would preclude multiple punishment. Because the full-term consecutive sentence was imposed by the trial court under the authority of section 667.6, subdivision (c), however, we must determine whether section 654 does apply.

Section 667.6, subdivision (c), provides in pertinent part: "In lieu of the term provided in Section 1170.1, a full, separate, and consecutive term may be imposed for each violation of . . . Section 289 . . . whether or not the crimes were committed during a single transaction." In *People* v. *Siko, supra,* 45 Cal.3d 820, the Supreme Court held that the enactment of section 667.6, subdivision (c), did not repeal the prohibition in section 654 against multiple punishment for a *single act or omission.* The court was careful to note, however, that the case before it "does not present the question of whether or not the enactment of subdivision (c) was intended by the Legislature to abrogate or modify the judicially engrafted *'indivisible' or 'single transaction' rule.*" (*Id.,* at p. 822, italics added; compare *People* v. *Craft* (1986) 41 Cal.3d 554, 559, fn. 2 [224 Cal.Rptr. 626, 715 P.2d 585].)

The defendant in *Siko* received consecutive full-term sentences pursuant to section 667.6, subdivision (c), upon his conviction of forcible rape, forcible sodomy, and forcible lewd conduct with a child under the age of 14 years. Because "the lewd conduct for which defendant was convicted consisted only of the rape and the sodomy," the court held that section 654's proscription against "multiple punishment for a single 'act or omission'" would be violated by punishing the defendant on all three convictions when he committed only two criminal acts. (*People* v. *Siko, supra,* 45 Cal.3d 820, 823.)

The court rejected the People's argument that by enacting section 667.6, subdivision (c) (hereafter sometimes subdivision (c)), "the Legislature im-

pliedly repealed the prohibition in section 654 on multiple punishment for violations based on the 'same act or omission' insofar as that prohibition might otherwise apply to the sex offenses listed in the subdivision." (45 Cal.3d at p. 824.) Noting that subdivision (c) does not express such an intention and that repeal by implication is disfavored, the court held: "the Legislature did not intend subdivision (c) to carve out an implied exception to section 654 by allowing a *single act* to be punished twice." (*Id.*, at p. 825, italics added.)

In so holding, the court rejected the People's contention that the phrase in subdivision (c) authorizing separate punishment "whether or not the crimes were committed during a single transaction" demonstrates a legislative intent to repeal, in part, section 654. The People argued "that because subdivision (c) authorizes multiple punishment even when the separate crimes constitute a 'single transaction,' it reflects an intent to change the rule . . . that section 654 prohibits multiple punishment whenever the defendant's actions form a 'single' or 'indivisible transaction.' " (45 Cal.3d at p. 825.) The court deemed this argument "irrelevant," because in *Siko* "the People do not seek to punish three acts once each; they seek to punish the same two acts twice. This violates section 654, but it does not implicate the 'single' or 'indivisible transaction' rule." (*Ibid.*) The court concluded: "Whatever the Legislature's intent may have been with respect to the 'single' or 'indivisible transaction' rule, it is clear to us it did not intend by its enactment of subdivision (c) to repeal or amend the prohibition of double punishment for multiple violations of the Penal Code based on the 'same act or omission.' " (*Id.*, at p. 826.)

The case before us presents the question left unresolved in *Siko*, namely whether the Legislature's authorization of consecutive full-term sentences for enumerated sex offenses, "whether or not the crimes were committed during a single transaction," creates an exception to section 654's prohibition against multiple punishment for *separate acts* committed during an indivisible course of conduct.

We of course begin our efforts to determine the intent of the Legislature with an examination of the words of the statute. (*Tracy* v. *Municipal Court* (1978) 22 Cal.3d 760, 764 [150 Cal.Rptr. 785, 587 P.2d 227].) As noted in the opinion in *Siko*, subdivision (c) contains no direct reference to section 654. We must decide if the phrase "whether or not the crimes were committed during a single transaction," as used in subdivision (c), expresses a *legislative intent to repeal or amend section 654's prohibition of multiple punishment for separate acts committed during a single or indivisible course of conduct.

Although section 654 "literally applies only where [multiple] punishment arises out of multiple statutory violations produced by the 'same act or

omission,'" decisions interpreting section 654 have extended its protection "to cases in which there are several offenses committed during 'a course of conduct deemed to be indivisible in time.' [Citation.]" (*People* v. *Harrison, supra,* 48 Cal.3d 321, 335.) ■ "[S]ection 654 applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction. [Citation.]" (*People* v. *Perez, supra,* 23 Cal.3d 545, 551.)

■ Although the language in subdivision (c) authorizing consecutive sentences "whether or not the crimes were committed during a single transaction" is not plain and unambiguous (*People* v. *Jones* (1988) 46 Cal.3d 585, 593 [250 Cal.Rptr. 635, 738 P.2d 1165]), the only reasonable interpretation of the statute is that it creates an exception to section 654's prohibition against multiple punishment for separate offenses committed during an indivisible course of conduct. Had the Legislature used the term "indivisible transaction" rather than the term "single transaction," this conclusion would be beyond dispute. In the present context, however, the words "single" and "indivisible" have nearly identical meanings. We perceive no reasonable interpretation of the statutory language "whether or not the crimes were committed during a single transaction" other than that the phrase allows imposition of full-term consecutive sentences where one of the offenses enumerated in the statute was a separate act constituting part of an indivisible course of conduct, notwithstanding the provisions of section 654.

An examination of the legislative history of subdivision (c) does not lead to a different conclusion. As originally drafted in March 1979, subdivision (c) mandated consecutive full-term sentences for enumerated sex offenses "whether or not the crimes were committed with a single intent or objective or during a single transaction." (Sen. Amend. to Sen. Bill No. 13 (1979-1980 Reg. Sess.) Mar. 5, 1979.) The above-quoted language prompted the Senate Committee on Judiciary, in analyzing the bill, to query whether the author intended to "*mandate,* in apparent disregard of Section 654, multiple punishments for sexual offenses committed during a single transaction." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 13 (1979-1980 Reg. Sess.) as amended Mar. 5, 1979, pp. 8-9, italics in original.)

On July 5, 1979, Senate Bill No. 13 was amended by deleting from subdivision (c) the phrase "with a single intent or objective." The provision thus mandated full-term consecutive sentences for the enumerated offenses "whether or not the crimes were committed during a single transaction." (Sen. Amend. to Sen. Bill No. 13 (1979-1980 Reg. Sess.) July 5, 1979.) On August 30, 1979, the bill was amended to its final form, making discretionary the imposition of full-term consecutive sentences under subdivision (c)

and adding subdivision (d), which mandates full-term consecutive sentences "if such crimes involve separate victims or involve the same victim on separate occasions."

The reason for amending the phrase "whether or not the crimes were committed with a single intent or objective or during a single transaction" is not apparent from the legislative materials we have examined. In its original form, subdivision (c) clearly was inconsistent with section 654, because consecutive sentences for offenses committed with a single intent or objective during a single transaction would violate section 654's proscription against multiple punishment for an indivisible course of conduct. Had the Legislature intended by deleting the phrase "with a single intent or objective" to ensure that the provisions of section 654 would remain applicable, it presumably also would have deleted the phrase "whether or not the crimes were committed during a single transaction." Although the Legislature's reason for omitting the reference to a single intent or objective remains unclear, the only reasonable explanation for the retention of the phrase "whether or not the crimes were committed during a single transaction" is that the Legislature intended to create an exception (to section 654's prohibition against multiple punishment) applicable where separate acts are committed during an indivisible course of conduct.

Our interpretation of section 667.6, subdivision (c), produces a reasonable result in the present case. Subdivision (c) was intended to permit the imposition of more severe punishment where a defendant commits multiple offenses constituting separate acts, one or more of which is enumerated in the statute. (*People* v. *Craft, supra*, 41 Cal.3d 554, 560.) Such increased penalties are appropriate because a defendant who commits "a number of base criminal acts on his victim is substantially more culpable than a defendant who commits only one such act." (*People* v. *Perez, supra*, 23 Cal.3d 545, 553.)

■ In the present case, the barrel of a shotgun forcibly was inserted into Argostino's rectum, causing her pain and necessitating subsequent medical treatment. Although this offense was a means of facilitating the robbery for which the defendants were separately punished, the sexual violation of Argostino subjected her to additional pain, humiliation, and risk of injury, justifying greater punishment. (See *People* v. *Marks* (1986) 184 Cal.App.3d 458, 466 [229 Cal.Rptr. 107].)

We recognize that a rational argument could be made for the opposite conclusion that the Legislature did not intend to render the provisions of section 654 inapplicable when a full-term consecutive sentence is imposed under subdivision (c). ■ As noted above, the statutory language is

unclear and ambiguous. We also are aware of the rule that, in a criminal case, where "two reasonable interpretations of the same provision stand in relative equipoise," " ' "ordinarily that construction which is more favorable to the offender will be adopted." ' " (*People* v. *Jones, supra,* 46 Cal.3d 585, 599.)

The two possible constructions of subdivision (c), however, are not equally reasonable. The interpretation that subdivision (c) does not create an exception to application of section 654 for offenses which form an indivisible transaction would leave entirely without meaning the statutory language "whether or not the crimes were committed during a single transaction." "[A] statute should not be given a construction that results in rendering one of its provisions nugatory. [Citations.]" (*People* v. *Craft, supra,* 41 Cal.3d 554, 560.) " ' "Significance if possible should be attributed to every word, phrase, sentence and part of an act in pursuance of the legislative purpose. [Citation.]" ' " (*Jutzi* v. *County of Los Angeles* (1987) 196 Cal.App.3d 637, 650 [242 Cal.Rptr. 74].)

We conclude that the imposition of full-term consecutive sentences pursuant to section 667.6, subdivision (c), for the commission of offenses constituting separate acts, renders inapplicable section 654's proscription against multiple punishment for offenses committed during an indivisible course of conduct.

## DISPOSITION

The judgment is affirmed.

Goertzen, J., and Todd, J.,* concurred.

Appellants' petitions for review by the Supreme Court were denied September 20, 1990. Broussard, J., was of the opinion that the petitions should be granted.

---

* Assigned by the Chairperson of the Judicial Council.